IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRIAN L. HEFT,

      Petitioner,                                **CASE NO. 2:11-CV-103**

      v.                                       **Judge Frost**
                                               **Magistrate Judge King**

WARDEN, MADISON CORRECTIONAL
INSTITUTION,

      Respondent.

ORDER and
REPORT AND RECOMMENDATION

Petitioner[1] brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition*, Doc. No. 1, Respondent's *Return of Writ,* Doc. No. 16, Petitioner's *Traverse,* Doc. No. 30, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

Petitioner's motion for an evidentiary hearing, Doc. No. 35, is **DENIED.** His motions to supplement the record, Doc. Nos. 29, 36, are **DENIED.** Petitioner's motion to withdraw certain claims from his habeas corpus petition, Doc. No. 43, is **GRANTED**.

FACTS and PROCEDURAL HISTORY

The Ohio Third District Court of Appeals summarized the facts and procedural history of this case as follows:

> In September 2007, the Logan County Grand Jury indicted Heft on Count One: rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; Count Two: rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; Count Three: sexual battery in violation of

---

[1] Petitioner is apparently no longer incarcerated. *See Notification of Change of Address*, Doc. No. 28.

R.C. 2907.03(A)(5), a felony of the third degree; Count Four: sexual battery in violation of R.C. 2907.03(A)(5), a felony of the third degree; Count Five: gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree; and, Counts Six, Seven, Eight, Nine, and Ten: gross sexual imposition in violation of R.C. 2907.05(A)(1), all felonies of the fourth degree. The indictment stemmed from a multiple year course of conduct during which Heft allegedly sexually abused his stepdaughter, S.W.

In December 2007, Heft waived his speedy trial rights. Additionally, Heft filed a motion to continue the jury trial, which had been scheduled for January 8, 2008 [FN1] on the basis that he required additional time to prepare for trial. Thereafter, the trial court vacated the trial date of January 8, 2008, and rescheduled the date to February 21, 2008.

FN1. Heft's motion stated that the trial was scheduled for January 8, 2007; however, the year was clearly a typographical error, given that the motion was filed in December 2007.

In February 2008, Heft filed a motion to vacate the trial date of February 21, 2008, on the basis that he again required additional time to prepare for trial. Additionally, Heft reiterated that he waived his right to have the case tried within the statutory period. Thereafter, the trial court vacated the trial date of February 21, 2008, and rescheduled the date to April 29, 2008.

In April 2008, the State moved the trial court for an order pursuant to Crim.R. 7(D) to amend the indictment to include in each charge the culpable mental state.

In May 2008, the trial court overruled the State's motion to amend the indictment, and dismissed the September 2007 indictment without prejudice.

In July 2008, the Logan County Grand Jury indicted Heft on Count One: rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; Count Two: sexual battery in violation of R.C. 2907.03(A)(5), a felony of the third degree; Count Three: gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree; and, Count Four: gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree. Thereafter, Heft entered a plea of not guilty to all counts in the indictment.

2

In August 2008, Heft filed a motion to dismiss the indictment on the basis that the State had violated his speedy trial rights, and that the speedy trial waivers he had filed in conjunction with the September 2007 indictment did not apply to the July 2008 indictment.

In September 2008, the trial court overruled Heft's motion to dismiss, finding that, unlike a speedy trial waiver, periods of delay resulting from motions filed by the defendant in a previous case also apply in a subsequent case based on the same underlying facts and circumstances.

In October 2008, Heft filed a motion to vacate the trial date of October 28, 2008, which the trial court granted, assigning the matter for jury trial on February 18, 2009.

In February 2009, the case proceeded to jury trial, at which the following testimony was heard.

Officer Andrew Kennedy of the Bellefontaine Police Department testified that, on July 23, 2007, he spoke to S.W. at the police department; that S.W. was accompanied by her friend, Victoria Early, and her friend's mother, Bridget Early; that it was very difficult for S.W. to speak and she was emotional; and, that S.W. alleged that she had been sexually abused by Heft, and detailed multiple specific incidents of sexual abuse.

Victoria Early testified that she had been close friends with S.W. for about five years at the time of the trial; that she observed S.W. and Heft interact as stepparent and stepdaughter on many occasions; that she did not believe Heft was as encouraging as a father figure should be; that Heft made negative comments to S.W. about her weight and appearance; that Heft also had a negative attitude regarding S.W.'s boyfriends; that Heft was rude to S.W.'s boyfriend and called him names; that S.W.'s role in the household was uncommon because she often cooked, cleaned, and looked after her younger brother; that she believed S.W. had taken on this role because S.W.'s mother, Bridget Heft, had health issues; that she observed that Bridget Heft spent most of the day watching television and drinking alcoholic beverages, and that she did not really clean; and, that, from her observations, she believed Heft and Bridget had more of a friendship than a marriage.

Early continued that, on the third Thursday of July in 2007, S.W. called her and asked her to pick her up; that S.W. was very distressed and upset; that S.W. came out of the house carrying her work

3

clothing, but nothing else; that S.W. stayed at the Earlys' home from Thursday until Sunday; that she thought it was strange that S.W. brought no other clothing with her; that, when she arrived home from work at approximately 7:00 a.m., she and her mother watched a movie about a young woman being raped and then testifying in court; that S.W. awoke and came down to watch the movie; that S.W. appeared upset during the movie, but that did not surprise her because "she had been upset pretty much the whole weekend" (trial tr., p. 120); that, after the movie ended, S.W. began crying, told her and her mother that she had something she needed to tell them, and said that she could never go back home; that her mother called S .W.'s older brother, Nick, to pick her up; that she and her mother then accompanied S.W. to the police station, where police officers interviewed S.W.; that she never witnessed any sexual acts between Heft and S.W. or heard S.W. make such accusations in the past; and, that the Heft family was always pleasant to her when she was at their home.

Detective Scott Sebring of the Bellefontaine Police Department testified that, through his training, he was aware that many child victims of sexual abuse delay disclosure due to fear of not being believed, fear of discipline, fear of financial difficulty if the perpetrator is the primary financial support of the family, and fear of breaking up the family; that he interviewed Heft after he was arrested; that Heft denied the allegations; that he also interviewed Bridget Heft, who told him that she did not know anything about the allegations and that S.W. had never made such allegations to her; that, although S.W. had told him that her step-grandmother who lived with the family was suspicious of Heft, he did not interview the step-grandmother; that he did not examine either the Heft family's prior or current residence for DNA evidence; that he did not believe he would find any forensic evidence in the Hefts' household because it was clean and well-kept; and, that he did not examine any computers in the household because there was no indication that anything relevant would be contained on a computer.

S.W. testified that, throughout her childhood, she lived in a household with her stepfather, Heft, her mother, Bridget Heft, her younger brother, Shawn, her older brother, Nick, and intermittently her step-grandmother, Beatrice; that Heft and her mother married when she was two years old, and he was the only father figure she had known; that the family resided on Reservoir Road in Bellefontaine between the dates of January 19, 2001, and June 3, 2004; that the family resided on Highview Drive in Bellefontaine

4

between the dates of June 3, 2004, and July 23, 2007; that Heft was the primary financial provider for the family because her mother did not work, although she received social security payments; that her mother suffered multiple strokes and required brain surgery prior to the family moving to Bellefontaine in 2001; that her mother's stroke changed the dynamics of the household because she could no longer take care of the children due to speech problems and difficulties with her hand; that she did whatever she could to help take care of her younger brother and clean; that she rarely saw Heft and her mother together; that her mother watched television often and would drink several cans of beer per night; that her mother would consume alcohol to the point that she would stumble and nearly fall; and, that she did not believe it was the stroke that caused her mother to lose her balance.

S.W. continued that she did not get along well with Heft; that Heft sexually abused her when the family lived at both the Reservoir Road and Highview Drive residences; that, on Christmas Eve in 2001 or 2002, when the family lived on Reservoir Road, Heft had stayed up at night to cook a turkey; that Heft came into her room that night and summoned her to the door; that she went over to the door, and Heft pulled her pants and underwear down; that Heft attempted to kiss her near her vagina; that she pulled her pants and underwear up and went over to her bed to lie down, and Heft left the room; that Heft then came back into her room, pulled her covers off, pulled her pants down, and "started kissing [her] all over [her] body" ( Id. at 171, 537 N.E.2d 188); that she attempted to keep her pants up, but Heft continued to try to kiss her lower and lower; that she could not do anything to stop him but attempt to keep her pants up; that Heft "succeeded in everything that he tried" ( Id. at 172, 537 N.E.2d 188); that other people were in the home when this incident occurred, but they were asleep; that she did not tell anyone immediately after the incident occurred because Heft "had threatened that if anything happened to him, [her] mom and brother would both be out on the streets" ( Id. at 174, 537 N.E.2d 188); that she took Heft's threats seriously because he was manipulative and controlling and she was afraid of him; that, when Heft would become angry with her, he would tell her mother that she was treating him like "dirt"; and, that she never consented to Heft touching her in a sexual manner.

S.W. continued that many instances of sexual abuse occurred once the family moved to the Highview residence; that, approximately every other day, while she was sleeping in her room, Heft would touch her breasts without her consent; that she tried to keep her arms

as tight as she could, but it did not prevent Heft; that the abuse impacted her to the point that she overdosed on prescription Amitriptyline in June 2006; that she took the medication with the goal of killing herself because she "couldn't take the abuse" ( Id. at 187, 537 N.E.2d 188); that, on one occasion in July 2006 during the week of the Logan County Fair, she came home from tennis practice to get permission to go to the fair; that Heft told her to lie on his bed, and then "scooted" her to the edge of the bed; that Heft removed her pants and underwear, opened her legs, and engaged in vaginal intercourse with her for several minutes; that she "pretty much just laid [sic] there and waited for it to be over" ( Id. at 181, 537 N.E.2d 188); that, when the assault ended, she retrieved her clothing and went to the fair; that no one else was in the home at the time of this assault, and she believed her mother had taken her younger brother to run errands, as she did from time to time; that, sometime after the fair ended, in August 2006, Heft again engaged in vaginal intercourse with her in his bed; that this occasion was not as forceful as the first, but "it wasn't easy to stop him either" ( Id. at 185, 537 N.E.2d 188); that Heft never mentioned the abuse except when it was occurring, except that he would ask her questions such as "do you think my penis is big" ( Id. at 188); that Heft told her that "he didn't feel like he was [her] father and that he didn't feel like [she] was his daughter because [they] weren't blood" and that the only two people he loved "in that way" were her and her mother ( Id. at 188); that Heft threatened to leave her mother and brother if she told anyone about the abuse; that, in July 2007, she went to visit a college with a friend, which provoked an argument between her and Heft; that she "couldn't take it" so she left to go to the Early household for several days ( Id . at 194); that, on Sunday, she watched part of a movie with Victoria and Bridget Early about a woman who had been sexually abused; that she had flashbacks of Heft abusing her and became very emotional; that she began crying and told Victoria and Bridget Early about the abuse; that she did not make up the story about the abuse in order to get out of the home and her tumultuous relationship with her parents; and, that the movie did not plant the idea of sexual abuse accusations in her head.

On cross-examination, S.W. testified that the incident on Christmas Eve at the Reservoir Road residence may have occurred in 2002 and not 2001, if receipts existed demonstrating that the family was not at home, but in Canal Winchester, on Christmas Eve in 2001; that she could not remember if the first instance of penetration occurred when she was sixteen, seventeen, or eighteen; that the second incident occurred in August before school started, but she could not remember

the exact date; that her attempted suicide on Father's Day in 2006 occurred prior to the incidents of penetration, but after some of the touching incidents; that she lied to the hospital staff and told them she was not trying to kill herself; that it is possible she told the hospital staff that she and her parents were arguing because she was staying out late with her boyfriend, but she did not remember; that, the day she left home, her parents were not having any problems with her; that her parents did not complain to her that she was not completing her forms for college; that her parents did not have a problem with her staying out late; that they did not tell her to "straighten up" or move out; that she never told the police that her mother was mentally disabled, and the police report stating that was a mistake; that, although she helped cook and clean in the household, her mother did most of it; that she never did laundry; that she told her friends she was doing a lot of cooking and cleaning at the house; that she did not tell her mother about the penetration incidents because she had "told her once before and she never did anything" ( Id. at 230, 537 N.E.2d 188); and, that, on Father's Day in 2007, several months before making the accusations, she gave Heft a card telling him that she appreciated everything he did for her, was glad he was her father, would always love him, and that he was the "greatest father in the whole world." ( Id. at 236, 537 N.E.2d 188).

Thereafter, the State rested and Heft moved for dismissal of the indictment pursuant to Crim.R. 29. The trial court overruled Heft's motion. Heft then testified in his defense.

Heft testified that he had never been involved with a criminal investigation prior to this proceeding; that his wife and S.W.'s mother, Bridget Heft, suffered a stoke in 1999; that her stroke resulted in her having physical difficulties with her hand and some speech problems, but she had no mental disabilities; that S .W. never took care of the home and did not cook or clean; that, in fact, the family had issues with S.W. completing her assigned chores; that he and Bridget had a normal marital relationship, evidenced by the fact that Bridget had a son, Shawn, a year after she suffered the stroke; that his relationship with S.W. the first few years of his marriage to Bridget was "great"; that, as S.W. became a teenager, she became more challenging because she was argumentative and wanted to go out a lot; that he and Bridget expected S.W. to help out around the house and to get a job for her extra spending money, but she refused; that S.W. would throw temper tantrums, scream, cry, and "have attitudes" ( Id. at 254, 537 N.E.2d 188); that, on Christmas Eve in 2001, the family was in Canal Winchester, corroborated by a gas

station receipt; that his mother, S.W.'s step-grandmother, Beatrice, lived at the residence and was agoraphobic, so she never left the home; that S.W. was not permitted to date boys he considered to be inappropriate, which made her angry; that S.W. was permitted to date a boy named Grant, and the family included him in several family get-togethers; that, on Father's Day in 2006, he and Bridget argued with S.W. about her behavior, and she then overdosed on pills; that S.W. reported to the hospital staff that she intentionally overdosed due to arguments with her parents over her boyfriend, but then later reported she had just accidentally taken too many pills; that, in July and August 2006, he went out of state on business, departing the end of "fair week", and returning several weeks later when he underwent surgery for blood clots; that he helped S.W. fill out her college entrance exam forms, college applications, and financial aid forms; that S.W. did not really help with the forms or pay the fees, which caused problems between the two of them; that, the day S.W. left the home, he returned from work and S.W. was instigating Shawn to run around the room, despite the fact that he had just had his tonsils out; that he became angry because he felt she had put Shawn's health at risk, and the two began to argue; that he told S.W. "you're 17 years old. You need to straighten up your attitude or find another place to live. We can't handle this anymore-or 18, I'm sorry" ( Id. at 271, 537 N.E.2d 188); that S.W. chose to leave the home; and, that, several days later, he was arrested at work and learned of S.W.'s accusations of sexual abuse.

On cross-examination, Heft testified that his income constituted the bulk of the household funds; that he did not know why S.W. would make false accusations against him, but speculated it was due to financial concerns, arguing, and the influence of her friends.

Bridget Heft testified that she suffered a stroke in 1999; that her condition had improved over the years; that she continued to have physical difficulties with one hand, but had no mental problems; that she never saw Heft act inappropriately toward S.W. or touch her inappropriately; that S.W. never approached her with any accusations against Heft; that she drank four to six alcoholic beverages each evening; that Heft's mother and S.W.'s step-grandmother, Beatrice, lived in the household most of the time; that Beatrice was always in the home unless she took her to a doctors appointment or to a store; that she and Heft had a normal marital relationship; that she did all of the cooking, cleaning, and laundry in the home, and could not imagine S.W. saying that she did it; that, the day S.W. left the home, she had been throwing a ball across the room and telling Shawn to

8

run to get it; that she told S.W. to stop making Shawn run; that Heft came home and told S.W. not to have Shawn run because he recently had surgery; that Heft and S.W. then argued about her forms for college; that the argument culminated in Heft telling S.W., "you'll own up to the rules or you can get out" ( Id. at 307, 537 N.E.2d 188); and, that S.W. then left the home.

After the close of testimony, the jury returned verdicts of guilty on Counts Three and Four, finding Heft guilty of two counts of gross sexual imposition. The jury was unable to reach a verdict on Counts One and Two, which were consequently dismissed upon the State's motion.

In April 2009, the trial court ordered Heft to serve a fifteen-month prison term on Count Three, and a fifteen-month prison term on Count Four, to be served consecutively. Additionally, the trial court classified Heft as a Tier I sexual offender.

*State v. Heft*, No. 8-09-08, 2009 WL 3720562, at *1-6 (Ohio App. 3rd Dist. Nov. 9, 2009). Petitioner

filed a timely appeal, raising the following assignments of error:

Assignment of Error No. I

OHIO REVISED CODE SECTION 2907.05 IS UNCONSTITUTIONAL AS IT IS APPLIED TO APPELLANT AND OTHERS SIMILARLY SITUATED BECAUSE IT IS VAGUE AND OVERBROAD AND CONFLICTS WITH THE REQUIREMENTS OF OHIO REVISED CODE SECTION 2907.06.

Assignment of Error No. II

THE TRIAL COURT ERRED WHEN IT ORDERED CONSECUTIVE SENTENCES.

Assignment of Error No. III

THE VERDICTS ON THE GROSS SEXUAL IMPOSITION COUNTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

Assignment of Error No. IV

APPELLANT WAS PREJUDICED BY THE COURT'S HOWARD

9

CHARGE TO THE JURY WHEN THE JURY INDICATED IT COULD NOT COME TO A VERDICT.

Assignment of Error No. V

APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.

Assignment of Error No. VI

THE SECOND INDICTMENT WAS CONSTITUTIONALLY DEFICIENT AS IT WAS INTENTIONALLY VAGUE [SIC] THAT IT EFFECTIVELY DENIED APPELLANT THE ABILITY TO FORM A PROPER DEFENSE, EVEN THOUGH THE STATE PRESENTED EVIDENCE TO A SPECIFIC DATE DURING TRIAL WHICH WAS NEVER DISCLOSED THROUGH THE BILL OF PARTICULARS OR IN ANY SUBSEQUENT PLEADING.

Assignment of Error No. VII

APPELLANT DID NOT RECEIVE A FAIR TRIAL WHEN THE COURT PERMITTED THE INTRODUCTION OF EVIDENCE OF OTHER BAD ACTS, BY ALLOWING THE VICTIM TO TESTIFY IN VAGUE TERMS AS TO WHEN EACH OF THE CRIMES OCCURRED, ATTEMPTING TO INCORPORATE ALLEGED MULTIPLE INCIDENTS TO PROVE ONE CERTAIN ACT AND THEN FAILED TO GIVE A LIMITING INSTRUCTION TO THE JURY.

Assignment of Error No. VIII

APPELLANT WAS DEPRIVED AFFECTIVE [SIC] ASSISTANCE OF COUNSEL WHEN COUNSEL [SIC] WHICH DEPRIVED APPELLANT A FAIR TRIAL

*Id*. at *6-7. On November 9, 2009, the appellate court affirmed the judgment of the trial court.[2] *Id*.

On March 10, 2010, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v.*

---

[2] The appellate court denied Petitioner's motion for reconsideration. *Exhibits 22, 23 to Return of Writ.*

*Heft*, 124 Ohio St.3d 1508 (2010).[3]

On November 13, 2009, Petitioner filed a petition to vacate judgment.  He raised the following claims:

1. Defendant-Petitioner was denied his right to a trial by an impartial jury as guaranteed by the Sixth Amendment of the United States Constitution and Section 5, Article 1 of the Ohio Constitution.

2. Defendant-Petitioner was denied his constitutional right to an impartial court as guaranteed by the Fourteenth Amendment of the United States Constitution.

3. Defendant-Petitioner has new evidence that the State's witness perjured herself in violation of Defendant-Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 1 and 16 of the Ohio Constitution.

4. Defendant-Petitioner was denied his right to receive exculpatory evidence as required by the Fourteenth Amendment of the United States Constitution.

*Exhibit 29 to Return of Writ*.  On January 6, 2010, the trial court dismissed Petitioner's post conviction petition as untimely.  *Exhibit 32 to Return of Writ*.  On April 12, 2010, the appellate court affirmed the trial court's judgment.  *Exhibit 37 to Return of Writ*.[4]  On August 25, 2010, the Ohio Supreme Court dismissed Petitioner's subsequent appeal as not involving any substantial constitutional question.  *Exhibit 42 to Return of Writ*.[5]

---

[3]  The Ohio Supreme Court denied Petitioner's motion for reconsideration.  *State v. Heft*, 125 Ohio St.3d 1417 (2010).

[4]  The state appellate court denied Petitioner's motion for reconsideration.  *Exhibit 39 to Return of Writ*.

[5]  The Ohio Supreme Court denied Petitioner's motion for reconsideration.  *Exhibit 44 to Return of Writ*.

On February 3, 2010, Petitioner filed an application for reopening of the appeal pursuant to Ohio Appellate Rule 26(B).  He asserted that he had been denied the effective assistance of appellate counsel because his attorney failed to raise on appeal the following claims:

> 1.  The trial court err[ed] to the prejudice of the appellant when it allowed the jury to have the transcripts of certain witnesses in the jury room during deliberations over objections of the appellant and in violation of appellant's Sixth Amendment to the United States Constitution['s] right to an impartial jury.
>
> 2.  Appellant was denied his right to a speedy trial in violation of the United States and Ohio Constitutions when the time between indictments was not counted against the State in the speedy trial calculations.
>
> 3.  Appellant was prejudiced when the prosecutor was allowed to testify during closing arguments to the veracity/truthfulness of a State's witness.
>
> 4.  Appellant was denied his right to a speedy trial in violation of the United States and Ohio constitutions when all time associated with the first presentment of the indictment was not counted against the State.
>
> 5.  Appellant was prejudiced when the prosecutor was allowed to testify concerning an alleged psychological theory introduced during the trial.
>
> 6.  Appellant was prejudiced by the cumulative effects of errors.

*Exhibit 45 to Return of Writ.*  Petitioner filed an amended Rule 26(B) application, asserting the denial of effective assistance of appellate counsel due to his attorney's failure to raise on appeal the following claim:

> Appellant's speedy trial time expired prior to the 12/11/08 journalization of the continuance, the original opinion did not calculate speedy trial time to the journalization.

12

*Exhibit 46 to Return of Writ*.  On March 26, 2010, the appellate court denied Petitioner's Rule 26(B) application.  *Exhibit 48 to Return of Writ*.  The state appellate court denied Petitioner's motion for reconsideration, as well as his motion to certify a conflict.  *Exhibit 51 to Return of Writ*.  On June 23, 2010, the Ohio Supreme Court dismissed Petitioner's subsequent appeal as not involving any substantial constitutional question.  *Exhibit 54 to Return of Writ*.  On May 5, 2010, the trial court issued a *Nunc Pro Tunc Judgment Entry of Sentencing*, and *Amended Nunc Pro Tunc Judgment Entry of Sentencing* pursuant to Petitioner's request.  *Exhibits 55, 56 to Return of Writ*.  Petitioner filed an appeal from the trial court's *Nunc Pro Tunc Judgment Entry of Sentencing*.  *Exhibit 58 to Return of Writ*.  On June 4, 2010, the appellate court *sua sponte* dismissed the appeal for lack of jurisdiction.  *Exhibit 59 to Return of Writ*.[6]    On October 13, 2010, the Ohio Supreme Court dismissed Petitioner's subsequent appeal.  *Exhibit 64 to Return of Writ*.  On December 1, 2010, the Ohio Supreme Court granted Petitioner's motion for reconsideration on Proposition of Law VII, staying the case pending decision in *State v. Lester*.  *Exhibit 66 to Return of Writ*.  On November 9, 2011, the Ohio Supreme Court dismissed Petitioner's appeal. *See State v. Lester*, 130 Ohio St.3d 303 (2011), syllabus 2 ("A nunc pro tunc judgment entry issued for the sole purpose of complying with Crim. R. 32(c) to correct a clerical omission in a final judgment entry is not a new final order from which a new appeal may be taken").  S*ee Notice of Ruling*, Doc. No. 33.

On February 1, 2011, Petitioner filed the *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He alleges that he is in the custody of the Respondent in violation of the Constitution of the United States based upon the following grounds:

---

[6]  The appellate court denied Petitioner's motion for reconsideration.  *Exhibit 61 to Return of Writ*.

13

1.  The Petitioner was denied his right to a speedy trial in violation of the 6th and 14th Amendments of the United States Constitution.  Also denied due process.

2.  The Petitioner was denied a fair trial and due process of law in violation of his rights under the 5th, 6th, and 14th Amendments of the U.S. Constitution when the jury in his case was deadlocked and the trial court gave a coercive instruction to persuade a verdict.

3.  Petitioner's due process rights under the Constitution of the United States were violated when the vague indictment failed to provide adequate notice and failed to inform him of the nature and cause of the accusations.

4.  Petitioner was denied equal treatment under the law in violation of his rights under the 5th, 6th, and 14th Amendments of the United States Constitution.

5.  The Petitioner was denied due process of law, equal treatment under the law, in violation of the 5th, 6th, and 14th Amendments of the United States Constitution when the trial court allowed, over objections, testimony of un-indicted other alleged acts.

6.  The Petitioner was denied his rights to due process of law and to a fair trial in violation of the 5th, 6th, and 14th Amendments of the United States Constitution when the verdicts on counts III and IV are against the manifest weight and sufficiency of evidence.

7.  The Petitioner was denied due process of law in violation of the 14th Amendment of the United States Constitution when he was given consecutive sentences.

8.  The Petitioner was denied effective assistance of appellate counsel in violation of the 6th Amendment of the United States Constitution when appellate counsel did not raise certain issues and did not effectively address (litigate) the issues that were raised.

9.  The Petitioner was deprived of meaningful access to the courts in violation of his rights under the 14th Amendment of the United States Constitution when his petition for post

14

conviction relief was improperly dismissed.

10. The Petitioner was denied his rights, including equal protection, under the 6th and 14th Amendments of the United States Constitution when the statute he was convicted under is vague and over broad and requires less evidence than a lower level offense in the same type of offense category.

11. The Petitioner was denied a fair trial in violation of the Due Process Clause of the 14th Amendment of the United States Constitution when: 1) The prosecutor/State of Ohio improperly vouched for the truthfulness of their witnesses, (2) The trial court gave the jury the transcripts of certain witnesses over objection from the Petitioner/Defendant, (3) The Petitioner has a picture he is confident (but not 100% sure) contains an image of a juror and SB [sic] before [t]he trial, (4) The Petitioner was prejudiced when a courthouse employee (the county law librarian) was a close friend of SB[sic] and potential witness and the Petitioner/Defendant was not told of the working relationship, (5) The Petitioner asserts he was denied exculpatory evidence.

12. The Petitioner was denied his rights under the 4th Amendment of the United States Constitution when a courthouse employee improperly went through his house without a search warrant.

13. The Petitioner was denied his right to confront witnesses in violation of the 6th Amendment of the United States Constitution when the prosecutor testified/stated during opening and/or closing arguments to alleged acts that were not introduced during the trial.

14. The Petitioner was deprived of a fair trial in violation of his rights under the United States Constitution when the cumulative effects of error denied him a fair trial.

15. The Petitioner has been denied due process of law and equal treatment under the law in violation of the 5th, 6th, and 14th Amendments of the United States Constitution when he has been denied a valid final appealable order.

On January 31, 2012, Petitioner moved to withdraw claims two, five, seven, nine, eleven, twelve and

fourteen. Doc. No. 43.  That motion is **GRANTED**.  Petitioner also withdrew claim four as a separate claim. *Traverse,* at 39.

It is the position of the Respondent that Petitioner's remaining claims are procedurally defaulted, not cognizable in these proceedings, or without merit.[7]

## MOTIONS TO SUPPLEMENT THE RECORD

Petitioner asks that Respondent be directed to supplement the record with a copy of defense exhibits admitted at trial, the defendant's witness list, the prosecution's motion *in limine*, and Petitioner's April 15, 2008 pre-trial brief.  *Motion to Add State Records*, Doc. No. 29.  Petitioner also asks for leave to supplement the record with certain documents attached to the motion, *i.e.*, the defendant's witness list and summary of expected content of proposed defense witness testimony, his pre-trial brief, and a list of potential defense documents supporting an alibi defense.  *Motion to Supplement the Record with Omitted State Records*, Doc. No. 35. According to Petitioner, these documents support his claim that he was denied his right to a speedy trial by showing how he was prejudiced by the State's delay in bringing him to trial.  Respondent opposes Petitioner's motion, *see Respondent's Opposition*, Doc. No. 39, arguing that Petitioner's claims have been waived, that the documents referred to by Petitioner fail to support his claims for relief, and that Petitioner failed to present these documents to the state courts in support of his claims.

Petitioner's motions to supplement the record, Doc. Nos. 29, 36, are **DENIED**. Consideration of the documents referred to by Petitioner is not required for the resolution of his speedy trial claim.  For reasons discussed *infra,* this Court concludes that Petitioner's claim that he

---

[7]  On July 12, 2011, the Court denied Respondent's *Motion to Dismiss* the *Petition* as unexhausted, and proceedings were stayed pending Petitioner's exhaustion of state court remedies. *Order,* Doc. No. 25.

was denied a speedy trial has been waived or, alternatively, is plainly without merit because it presents only an issue of state law.

## FAIR PRESENTMENT

In claim one, Petitioner asserts that he was denied his right to a speedy trial. Respondent contends that this claim has been waived because Petitioner failed to raise the issue as one of federal constitutional magnitude in the state courts; instead, according to Respondent, Petitioner argued only that his convictions violated Ohio's speedy trial statutes.

In order to satisfy the habeas corpus exhaustion requirement, a petitioner must fairly present the substance of each constitutional claim to the state courts as a federal constitutional claim. *Anderson v. Harless,* 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Although the fair presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999), it is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the state's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. In the Sixth Circuit, a petitioner can satisfy the fair presentment requirement in any one of four ways: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000). However, general allegations of the denial of a constitutional right, such as the right to a fair trial or to due process, are insufficient to satisfy the "fair presentment" requirement. *Id*.

Here, the record reflects that Petitioner argued his claim in the state courts as one regarding

the alleged violation of state law.  He referred to neither federal cases supporting his claim nor to state cases relying on the federal right to a speedy trial. Petitioner did generally refer to the Sixth Amendment guarantee of a speedy trial, arguing that "[b]oth the United States and Ohio Constitutions guarantee an accused the right to a speedy trial" and "[t]he Ohio Constitution mirrors the wording of the U.S. Constitution, in that they both state the accused has a right to a 'speedy and public trial by an impartial jury.'"  *Brief of Appellant, Exhibit 18* to *Return of Writ*, at 11. Thereafter, however, Petitioner presented his claim only in terms of an alleged violation of Ohio's speedy trial statute, restricting his argument to an analysis of the proper calculation of days under O.R.C. § 2945.71.  Moreover, and contrary to Petitioner's characterization of the state court record, the state appellate court reviewed his claim only for an alleged violation of state law.  *See State v. Heft,* 2009WL 3720562, at *9, 10.[8]  This Court is not persuaded by Petitioner's argument that the

---

[8]  The state appellate court rejected this claim as follows:

. . . Heft argues that he was denied his constitutional right to a speedy trial. Specifically, Heft contends that the matter came for trial 606 [FN2] days after his arrest, and, although he filed numerous motions which tolled the speedy trial time for the first indictment, the State still failed to try him within 270 days of the date of his arrest. We disagree.

FN2. This Court calculated the time for speedy trial purposes from Heft's arrest until trial as 578 days, as set forth in the chart below.

"Our standard of review upon an appeal raising a speedy trial issue is to count the expired days as directed by R.C. 2945.71, et seq." *State v. King*, 3d Dist. No. 9-06-18, 2007-Ohio-335, ¶ 30, citing *State v. DePue* (1994), 96 Ohio App.3d 513, 516, 645 N.E.2d 745. If any ambiguity exists, this court will construe the record in the defendant's favor. *Id.*, citing *State v. Mays* (1996), 108 Ohio App.3d 598, 609, 671 N.E.2d 553.

"Both the United States and Ohio Constitutions guarantee a criminal defendant the right to a speedy trial." *State v. Masters*, 172 Ohio App.3d 666, 876 N.E.2d 1007, 2007-Ohio-4229, ¶ 9, citing *State v. Baker*, 78 Ohio St.3d 108, 110, 676 N.E.2d 883, 1997-Ohio-229. In addition, Ohio statutes set forth specific time requirements necessary for compliance with the speedy-trial guarantee. The applicable statutory speedy-trial provision, R.C. 2945.71(C)(2), provides that "[a] person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after the person's arrest."

Additionally, R.C. 2945.73(B) provides that "[u]pon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the

time required by sections 2945.71 and 2945.72 of the Revised Code." Both R.C. 2945.71 and 2945.73 are mandatory, and strict compliance is required by the *State*. *King*, 2007-Ohio-335, at ¶ 32, citing *State v. Pudlock* (1975), 44 Ohio St.2d 104, 105, 338 N.E.2d 524. Therefore, when a criminal defendant shows that he was not brought to trial within the proper period, the burden shifts to the State to demonstrate that sufficient time was tolled or extended under the statute. *Masters*, 2007-Ohio-4229, at ¶ 10, 172 Ohio App.3d 666, 876 N.E.2d 1007, citing *State v. Butcher* (1986), 27 Ohio St.3d 28, 31, 500 N.E.2d 1368.

Time extensions are permitted in limited circumstances under R.C. 2945.72, including periods of delay "necessitated by reason of a * * * motion, proceeding, or action made or instituted by the accused[.]" R.C. 2945.72(E). Further, the Supreme Court of Ohio has held that "the accused may waive his constitutional right to a speedy trial, provided such waiver is knowingly and voluntarily made." *State v. O'Brien* (1987), 34 Ohio St.3d 7, 516 N.E.2d 218, citing *Barker v. Wingo* (1972), 407 U.S. 514, 529, 92 S.Ct. 2182, 33 L.Ed.2d 101.

The statutory time period begins to run on the date the defendant is arrested; however, the date of arrest is not counted when computing the time period. *Masters*, 2007-Ohio-4229, at ¶ 12, 172 Ohio App.3d 666, 876 N.E.2d 1007, citing *State v. Stewart* (1998), 12th Dist. No. CA98-03-021, 1998 WL 640909. Additionally, the triple-count statute, R.C. 2945.71(E), provides that, for computation purposes, each day an accused spends in jail in lieu of bond on the pending charge shall count as three days. *State v. Euton*, 3d Dist. No. 2-06-35, 2007-Ohio-6704, ¶ 24.

The Supreme Court of Ohio has specifically addressed speedy trial situations in which an original indictment is dismissed and a second indictment is later filed. In *State v. Broughton*, the Supreme Court held that, "[f]or purposes of computing how much time has run against the state under R.C. 2945.71 et seq., the time period between the dismissal without prejudice of an original indictment and the filing of a subsequent indictment, premised upon the same facts as alleged in the original indictment, shall not be counted unless the defendant is held in jail or released on bail pursuant to Crim.R. 12(I)." [FN3] 62 Ohio St.3d 253, 581 N.E.2d 541, at paragraph one of the syllabus. Further, Broughton noted that solely because a defendant may have suffered anxiety or apprehension during the period between the dismissal of the first indictment and reindictment does not mean the time period must be counted and attributed to the State for speedy trial purposes. 62 Ohio St.3d at 258, 581 N.E.2d 541, citing *State v. Bonarrigo* (1980), 62 Ohio St.2d 7, 11, 402 N.E.2d 530, citing *United States v. Hillegas* (C.A.2, 1978), 578 F.2d 453, 457-58. *See, also, State v. Gearhart,* 5th Dist. No. 99CA107, 2000 WL 329670*; State v. Tornstrom*, 8th Dist. No. 72898, 1998 WL 811314.

FN3. Former Crim.R. 12(I) is now Crim.R. 12(J), and provides, in pertinent part: "(J) Effect of determination: If the court grants a motion to dismiss based on a defect in the institution of the prosecution or in the indictment, information, or complaint, it may also order that the defendant be held in custody or that the defendant's bail be continued for a specified time not exceeding fourteen days, pending the filing of a new indictment, information, or complaint."

Appellate districts interpreting *Broughton* have subsequently found that a trial court's failure to explicitly declare that a defendant is released from bail in the entry of dismissal pursuant to Crim.R. 48(A) does not necessarily mean that the defendant's bail is continued pursuant to Crim.R. 12(J). *See State v. Buck*, 4th Dist. No. 98CA2438, 1999 WL 253485; *State v. Bieser*, 5th Dist. No. 06CA00045, 2007-Ohio-1960. In *Buck,* the Fourth Appellate District found no evidence in the record indicating that the trial court continued the defendant's bail following the dismissal of the original indictment pursuant to Crim.R. 12(J). Further, the appellate court noted that the defendant's recognizance form required him to comply with the bond terms "until such case is finally disposed of," and concluded that once the criminal charges were dismissed, the bail obligations were also extinguished.

state appellate court's brief statement recognizing that both the Ohio and the United States Constitutions guarantee to a criminal defendant the right to a speedy trial establishes that he preserved his federal claim for habeas corpus review.  Moreover, Petitioner did not raise his claim as one of federal constitutional magnitude in his Rule 26(B) proceedings.  *See Exhibit 45* to *Return of Writ.*

Petitioner argues that Ohio's statutory right to a speedy trial and the federal constitutional right to a speedy trial, the elements of which are set forth in *Barker v. Wingo*, 407 U.S. 514 (1972), are co-extensive, and that a denial of Ohio's speedy trial statute necessarily implicates the denial of

--------

Accordingly, the appellate court concluded that the trial court had intended for the defendant's bail obligation to terminate upon dismissal of the indictment and, pursuant to Broughton, found that the time period between the dismissal and the refiling was tolled.

In the case before us, Heft was arrested on July 24, 2007, and spent two days in jail, before being released on bond awaiting trial. The matter did not come to trial until February 18, 2009, 578 days after his arrest. Thus, at first observation, it appears Heft's speedy trial rights were violated.

The primary issue Heft and the State dispute as to allocation of days for speedy trial purposes is whether the time period between the dismissal of the first indictment and service of the second indictment is attributable to the State because Heft was under the "strain" of the impending second indictment and because nothing in the record demonstrates his bond was released from the first indictment. As in *Buck, supra*, neither Heft nor the State argue that Heft's bail was continued pursuant to the former Crim.R. 12(J), nor does the record suggest that the trial court continued Heft's bail pursuant to Crim.R. 12(J). Additionally, we reject Heft's argument that the time should not be tolled, but counted and attributed to the State, because he was under the strain of a second indictment. The Supreme Court expressly rejected this argument in *Broughton. See Broughton*, 62 Ohio St.3d at 258, 581 N.E.2d 541. Accordingly, we find that, as in *Buck* and *Broughton*, the time period between the dismissal of the first indictment and service of the second indictment was tolled and is not attributable to either party.

Considering the pertinent events in the case before us, we find the tolling events and days attributable to Heft and the State to be allocated as follows:

                  *            *            *            *

As [calculated by the court], the total number of days allocated to the State is below the 270 day limit, and Heft's speedy trial argument fails.

*State v. Heft*, 2009 WL 3720562, at *9-11.

the federal constitutional right to a speedy trial.  *See Traverse*.  In other words, Petitioner contends that, by raising this claim as one arising under state law, he has preserved his federal claim for review in these proceedings.  *See id.*  This Court disagrees.  "[T]he United States Supreme Court has found explicitly that there is 'no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months.'" *Kerby v. Brunsman*, No. 3:08cv287, 2011 WL 3566121, at *10 (S.D. Ohio April 28, 2011)(quoting *Barker,* 407 U.S. at 523)(concluding that the petitioner had failed to fairly present a federal speedy trial claim to state courts merely by raising the claim under state law).

This Court therefore concludes that Petitioner has waived claim one for federal habeas corpus review.

To the extent that Petitioner asserts an alleged violation of state law, this claim fails to present an issue appropriate for federal habeas corpus relief.  A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement is in violation of the Constitution, laws or treaties of the United States.  28 U.S.C. § 2254(a).  A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988).  A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).  "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition.  *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).  Only where the error resulted in the denial of fundamental fairness will habeas relief be granted.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).  Such are not the circumstances here.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If the petitioner fails to do so, but the state still provides a remedy to pursue, his or her petition is subject to dismissal for failure to exhaust state remedies. *Id.; Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004).  If, because of a procedural default, the petitioner can no longer present the relevant claims to a state court, the petitioner also waives the claims for purposes of federal habeas review unless he or she can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman*, 501 U.S. at 724; *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

In the Sixth Circuit, a court must undertake a four-part analysis to determine whether procedural default is a bar to a habeas petitioner's claims. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986); *see also Scuba v. Brigano*, 259 F. App'x. 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin* ). Specifically, the United States Court of Appeals for the Sixth Circuit requires the district courts to engage in the following inquiry:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.... Second, the court must decide whether the state courts actually enforced the state procedural sanction.... Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Maupin,* 785 F.2d at 138 (internal quotations omitted). Finally, if "the court determines that a state

22

procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his claims on the merits if he establishes: (1) a substantial reason to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error. *Id*. 'Cause' under this test "must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some factor external to the defense [that] impeded [ ] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level or failure to appeal at all. *Id* at 750.

Nevertheless, " '[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray,* 477 U.S. at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1892)). Petitioners who fail to show cause and prejudice for procedural default may nevertheless be entitled to review of their claims if they can demonstrate that a court's refusal to consider a claim would result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750; *see also Lott v. Coyle*, 261 F.3d 594, 601–02 (6th Cir. 2001) (same). This fundamental miscarriage of justice exception requires a showing that "in light of the new evidence, no juror, acting reasonably, would have voted to find [defendant] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

In claim three, Petitioner alleges that the indictment was unconstitutionally vague and failed to provide him notice of the charges or to inform him of the nature and cause of the accusations against him.  In claim ten, Petitioner asserts that the statute under which he was convicted is vague and over broad.  Petitioner properly raised these claims on direct appeal; however, the state appellate court reviewed the claims for plain error only, due to Petitioner's failure to raise the objections

before the trial court:

> In his sixth assignment of error, Heft contends that the second indictment was constitutionally deficient as it was intentionally vague, and that it effectively denied him the ability to form a proper defense, even though the State presented evidence of a specific date during the trial which was never disclosed through the bill of particulars or any other pleading. Specifically, Heft argues that it is unascertainable from the face of the indictment whether only two acts of gross sexual imposition were alleged, or whether the State was relying on testimony about many more acts, and merging these instances into one act during each time period. We disagree that the second indictment was constitutionally deficient.

> Initially, we note that Heft failed to object to the indictment prior to trial. As such, he has waived all but plain error. *See State v. Rohrbaugh*, 178 Ohio App.3d 211, 897 N.E.2d 238, 2008-Ohio-4781, ¶ 20; Crim.R. 12(C).

> A criminal indictment is sufficient only if it "(1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy." *Valentine v. Konteh* (C.A.6, 2005), 395 F.3d 626, 631. Additionally, courts have found that:

>> [w]here such crimes constitute sexual offenses against children, indictments need not state with specificity the dates of the alleged abuse, so long as the prosecution establishes that the offense was committed within the time frame alleged. This is partly due to the fact that the specific date and time of the offenses are not elements of the crimes charged. Moreover, many child victims are unable to remember exact dates and times, particularly where the crimes involved a repeated course of conduct over an extended period of time. The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse.

> *State v. Yaacov,* 8th Dist. No. 86674, 2006-Ohio-5321 (internal citations omitted); *see, also, State v. Mundy* (1994), 99 Ohio App.3d 275, 650 N.E.2d 502.

24

In *Valentine, supra*, a defendant was convicted of twenty counts of rape, based on twenty identically worded indictments, and twenty counts of felonious sexual penetration, based on twenty identically worded indictments. The federal appeals court reversed all but one of the rape convictions and all but one of the sexual penetration convictions, finding that the prosecution "did not distinguish the factual bases of these charges in the indictment, in the bill of particulars, or even at trial." 395 F.3d at 628. Consequently, the federal court found that the defendant "had notice that he was charged with two separate crimes during the period of time specified in the indictment. But he had no way to otherwise identify what he was to defend against in the repetitive counts and no way to determine what charges of a similar nature could be brought against him in the future if he were re-indicted." 395 F.3d at 628-29. Noting the lessened requirement of specificity in regards to date and time for indictments for sexual offenses against children, the court distinguished Valentine's case, stating that:

> [t]he problem in this case is not the fact that the prosecution did not provide the defendant with exact times and places. If there had been singular counts of each offense, the lack of particularity would not have presented the same problem. Instead, the problem is that within each set of 20 counts, there are absolutely no distinctions made. [The defendant] was prosecuted for two criminal acts that occurred twenty times each, rather than for forty separate criminal acts. In its charges and in its evidence before the jury, the prosecution did not attempt to lay out the factual bases of forty separate incidents that took place.

395 F.3d at 632. Additionally, *Valentine* noted that this situation presented double jeopardy concerns because it was unascertainable whether such a vague indictment would preclude future prosecution for incidents with the same victim during the same time frame. 395 F.3d at 635.

Here, Heft's July 2008 indictment reflects that the grand jury found the following:

COUNT I.

Brian L. Heft, between the dates of July 1, 2006 and August 31, 2006, at the county of Logan aforesaid, purposely engaged in sexual

25

conduct with another when the offender purposely compels the other person to submit by force or threat of force, in violation of Ohio Revised Code Section 2907.02(A)(2), Rape, a felony of the first degree.

COUNT II.

Brian L. Heft, between the dates of July 1, 2006 and August 31, 2006, at the county of Logan aforesaid, knowingly engaged in sexual conduct with another, not the spouse of the offender when the offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person, in violation of Ohio Revised Code § 2907.03(A)(5), Sexual Battery, a felony of the third degree.

COUNT III.

Brian L. Heft, between the dates of January 19, 2001 and June 2, 2004, at the county of Logan aforesaid, purposely had sexual contact with another, not the spouse of the offender; purposely caused another, not the spouse of the offender, to have sexual contact with the offender; or purposely caused two or more other persons to have sexual contact when the offender purposely compels the other person, or one of the other persons, to submit by force or threat of force, in violation of Ohio Revised Code § 2907.05(A)(1), Gross Sexual Imposition, a felony of the fourth degree.

COUNT IV.

Brian L. heft, between the dates of June 3, 2004 and July 21, 2007, at the county of Logan aforesaid, purposely had sexual contact with another, not the spouse of the offender; purposely caused another, not the spouse of the offender, to have sexual contact with the offender; or purposely caused two or more other persons to have sexual contact when the offender purposely compels the other person, or one of the other persons, to submit by force or threat of force, in violation of Ohio Revised Code R.C. § 2907.05(A)(1), Gross Sexual Imposition, a felony of the fourth degree.

We note that Heft filed no request for a bill of particulars as to this second indictment, nor did the State file one. Nevertheless, we find the case before us to be distinguishable from the situation presented in *Valentine* because the indictment provided Heft with adequate notice of the offenses as well as protection from double jeopardy.

26

Here, while the indictment does not specifically enumerate every instance of sexual contact the victim alleged over the six-year period, it sets forth a single representative count of gross sexual imposition for each household in which the family lived during the six-year period. Additionally, the indictment sets forth one count for the rape instance the victim alleged, and one count for the instance of sexual battery the victim alleged. We find that the indictment sufficiently connected each charge to a specific incident, providing Heft with adequate notice of the offenses against which he must defend. Further, it is clear that the jury differentiated between the incidents, as it acquitted Heft of the rape and sexual battery counts. *See State v. Meador*, 12th Dist. No. CA2008-03-042, 2009-Ohio-2195, ¶ 12, citing *Valentine*, 395 F.3d at 634.

Additionally, we find that the indictment protects Heft against double jeopardy because, unlike the defective indictment at issue in *Valentine*, Heft's indictment differentiated the counts by the type of offense alleged and the time period. As the counts were differentiated, Heft is protected against a subsequent prosecution for the same conduct. *See State v. Van Voorhis*, 3d Dist. No. 8-07-23, 2008-Ohio-3224, ¶ 44.

*State v. Heft,* 2009 WL 3720562, at *11-13.

The United States Court of Appeals for the Sixth Circuit has held that plain error review does not constitute a waiver of the state's procedural default rules. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown. *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005) (citing *State v. Smith*, 89 Ohio St.3d 323, 332, 731 N.E.2d 645 (2000)). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.; Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Stojetz v. Ishee*, 2006 WL 328155 *12 (S.D. Ohio Feb.10, 2006).

A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams,*

> 380 F.3d at 968; *Hinkle*, 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle*, 271 F.3d at 244 (citing *Ylst, v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).

*Adams v. Bradshaw*, 484 F.Supp.2d 753, 771 (N.D. Ohio 2007). Although the state appellate court, reasoning in the alternative, dismissed petitioner's claim on the merits, such alternative ruling does not forgive the waiver or otherwise revive the claim for purposes of habeas corpus review. *See Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding"); *Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003) (where state court's dismissal of claim on merits constitutes an alternative holding, federal habeas court will consider the claim procedurally defaulted).

Petitioner argues that he objected to the indictment as unconstitutionally vague and properly preserved his claim for review.  The record, however, fails to support this argument.  In making this argument, Petitioner refers to his counsel's statement, made during a discussion of jury instructions:

> Your Honor, I'd just like to make one point for the record. . . . The reason. . . there's some of the witnesses [sic] and so much discovery is because I've got an indictment and also a bill of particulars that spans a six-year period of time, and . . . what we're trying to do without giving away what our defense is is at least create a timeline or something with my client.  So it's hard. . . for me to tell you – until we get a witness who. . . can give us some specificity instead of, you know, between March 19th, 2001 to March 19, 2003, this event occurred; and then from 2002 to 2003 one event occurred, from 2004 to 2005, one event occurred.  I think it would be difficult for. . . us to put together a pretrial statement. . . as you suggest.
>
> Even the Bill of Particulars. . . it says it happened in Logan County, Reservoir Road and Highview Drive between the dates of March 19th, 2001, and March 18, 2007.  We're just trying to cover all of our bases because my client is innocent and we're trying to find every piece of

28

> information we can from the six-year period of time so when . . . the
> victim comes out and says something, we have a piece of evidence
> that maybe correlates to that time exonerating my client.

*Trial Transcript, at 17, Exhibit 4* to *Traverse*.  Petitioner also refers to the following statement by

his counsel, in response to the trial court's inquiry as to whether lengthy exhibits would be indexed

with copies provided to the State:

> I believe I've tried to do my best to kind of index it and consolidate
> it as much as I can.  Merely with the indefinite time period we're
> kind of dealing with, it's kind of hard for me to limit it any further
> until we kind of hear how the testimony is going to go.  I will,
> however, use my best effort to reduce. . . the time consumption of the
> introduction of the exhibits and use of any exhibits, and I think once
> we get going we might be better able to streamline those once we
> hear how the testimony's coming out.

*Id. at 51, Exhibit 5* to *Traverse*.  In the view of this Court, neither of these exchanges constitutes an

objection to the adequacy of the indictment sufficient to preserve these claims for federal habeas

corpus review.  Thus, Petitioner has waived claims three and ten.

In claim twelve, Petitioner asserts that he was convicted in violation of the Fourth

Amendment because a courthouse employee improperly went through his house without a search

warrant.  This claim, which does not appear on the face of the record, would properly be raised in

post conviction proceedings; however, Petitioner failed to raise this claim in his petition for post

conviction relief.  *See Exhibit 29* to *Return of Writ*.  Any attempt by Petitioner at this point to raise

this claim in a successive and untimely post conviction petition would most surely be barred.

O.R.C. § 2953.23 provides in relevant part:

> [A] court may not entertain a petition filed after the expiration of the
> period prescribed in division (A) of that section or a second petition
> or successive petitions for similar relief on behalf of a petitioner
> unless both of the following apply:

> (1) Either of the following applies:
>
> (a) The petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief.
>
> (b) Subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.
>
> (2) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

Petitioner has not established that he can meet this standard here. Under these circumstances, the state courts were never given the opportunity to enforce the procedural rule at issue due to the nature of Petitioner's procedural default.

The procedural rules barring this claim from federal habeas corpus review constitute adequate and independent state grounds for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The time requirement for filing post conviction actions and the requirement that all available claims be raised in the first such proceeding serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity.

Petitioner has waived his right to present claims three, ten and twelve for federal habeas corpus review. He can still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules as well as actual prejudice from the constitutional

violations that he alleges.  In the view of this Court,  Petitioner has failed to demonstrate either cause for his procedural defaults or actual prejudice resulting from the alleged constitutional violations.

Beyond the four-part Maupin analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333 (1992). After review of the record, the Court does not deem this to be such a case.

## CLAIM SIX

In claim six, Petitioner asserts that the evidence was constitutionally insufficient to sustain his convictions on gross sexual imposition as charged in counts three and four of the indictment.[9] Although Respondent did not raise the issue, the Court notes that Petitioner argued in the state appellate court only that the evidence was constitutionally insufficient to sustain his conviction on gross sexual imposition as charged in count three of the indictment.  Thus, for reasons discussed *supra*, Petitioner has waived this Court's review of any claim that the evidence was constitutionally insufficient to sustain his conviction on gross sexual imposition as charged in count four of the indictment.[10]

The state appellate court rejected this claim, reasoning in relevant part as follows:

> Heft contends that the entire case was based on S.W.'s unverified statements, and that S.W. was not credible because she lied to hospital staff about her attempted suicide, was inconsistent

---

[9] Petitioner has withdrawn his claim that his convictions were against the manifest weight of the evidence. *See Motion to Withdraw*, Doc. No. 43.

[10] As a general rule, procedural default is an affirmative defense that must be raised by the State or it will be waived.  *Trest v. Cain*, 522 U.S. 87, 89 (1997)(State's failure to raise procedural default normally constitutes waiver of the default); *Gray v. Netherland*, 518 U.S. 152, 166 (1996)(same).  A federal habeas court, however, may *sua sponte* raise a procedural default not expressly raised by the state particularly where, as here, Petitioner has the opportunity to respond to the procedural default in any objections he files.  *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005);  *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).

31

concerning the time frame during which she revealed the alleged abuse to Victoria and Bridget Early, and was mistaken about which year the Christmas Eve incident took place. Additionally. . . Heft argues that there was insufficient evidence to convict him of gross sexual imposition because the element of force was not demonstrated pertaining to Count Three of the indictment. We disagree[.]

*    *    *

Here, Heft is correct in his assertions that S.W.'s accusations were not corroborated by physical evidence; that her testimony had some inconsistencies; and, that she admitted she had lied to hospital staff. However, despite the lack of physical corroboration, inconsistencies, and S.W.'s admission to lying on that occasion, S.W. maintained that Heft had sexually abused her, which the jury apparently believed. . . .

We . . . turn to whether insufficient evidence was presented to convict Heft of Count Three. When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 392, 827 N.E.2d 285, 2005-Ohio-2282, citing *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, superseded by state constitutional amendment on other grounds as stated in *Smith, supra*. Sufficiency is a test of adequacy, *Thompkins, supra*, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, 124 N.E.2d 148, superseded by state constitutional amendment on other grounds as stated in Smith, *supra*.

Here, Heft contends that insufficient evidence was presented to demonstrate that he used force to commit gross sexual imposition as alleged in Count Three. Specifically, Heft contends that S.W. only testified that Heft approached her in the Reservoir Road residence, kissed her, that she walked away and lay on her bed, and that he came over and kissed her again. Heft contends that there was no evidence that he used any sort of physical force or that he threatened her.

Heft was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(1), which provides, in pertinent part:

(A) No person shall have sexual contact with another,

32

not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

The Revised Code defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). A victim "need not prove physical resistance to the offender" in order to demonstrate force. R.C. 2907.05(D). The Supreme Court of Ohio has addressed the issue of "force or threat of force" several times in the context of the rape statute, R.C. 2907.02. In *State v. Eskridge* (1988), 38 Ohio St.3d 56, 526 N.E.2d 304, the Court stated that, under R.C. 2907.02, the amount of force necessary to commit the offense "depends upon the age, size and strength of the parties and their relation to each other," 38 Ohio St.3d 56, 526 N.E.2d 304, at paragraph one of the syllabus, and that " ' * * * [f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' " 38 Ohio St.3d at 58-59, quoting *State v. Fowler* (1985), 27 Ohio App.3d 149, 154, 500 N.E.2d 390; *see, also, State v. Byrd*, 8th Dist. No. 82145, 2003-Ohio-3958, ¶ 26. Finally, the Court observed that " '[s]exual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.'" *Id.*, quoting *State v. Etheridge* (1987), 319 N.C. 34, 47, 352 S.E.2d 673, 681.

Here, Count Three indicted Heft for the incident occurring when the family resided at Reservoir Road from January 2001 until June 2004. On this occasion, S.W. testified that Heft came into her room, pulled her pants and underwear down, and attempted to kiss her near her vagina; that she pulled up her pants and underwear and lied [sic] down on her bed; that Heft came back into her room, pulled her covers off, and began kissing her body; that she attempted to keep her pants up, but Heft continued to kiss her and "succeeded in everything that he tried" (trial tr., p. 172); that she did not tell anyone about the

incident because Heft threatened that, if anything happened to him, her mother and brother would be "out on the streets" (*Id*. at 174, 352 S.E.2d 673); and, that she took Heft's threats seriously because he was manipulative and controlling, and she was afraid of him. Additionally, S.W. testified that Heft was her stepfather from the time she was two years old, and that he was the only father figure she had ever known.

We find that, from S.W.'s testimony, a jury could reasonably conclude that she resisted Heft's actions when he kissed her by attempting to keep her pants up, and that he physically and psychologically forced her to submit, particularly given their parent-child relationship and Heft's control over her. *See Eskridge, supra*. Thus, we find that sufficient evidence was heard to demonstrate that Heft used force to commit gross sexual imposition as alleged in Count Three.

*State v. Heft*, 2009 WL 3720562, at *18-20.

The factual findings of the state appellate court are presumed to be correct.

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

34

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

. 28 U.S.C. § 2254(d) .  In order to obtain habeas corpus relief, a petitioner must show that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Bobby v. Dixon*, – S.Ct. –, 2011 WL 5299458, at *1 (Nov. 7, 2011)(quoting *Harrington v. Richter,* 562 U.S. ——, ——, 131 S.Ct. 770, 786–87 (2011)).  This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Harrington*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia,* 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id*. (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be evidence sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, at 319).  The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume – even if it does not appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. (quoting *Jackson,* at 326).

35

Federal habeas courts must afford a "double layer" of deference to state court determinations about the sufficiency of the evidence to sustain a conviction. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due the jury's finding of guilt because the standard, announced in *Jackson v. Virginia,* is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *See also White v. Steele*, 602 F.3d 707, 710 (6th Cir.2009). This is a substantial hurdle for a habeas corpus petitioner to overcome and Petitioner has not done so.

Petitioner raises in this Court the same arguments that he raised in the Ohio Court of Appeals.  He complains that there was no physical evidence or corroborating witnesses, and he asserts that the State failed to prove all of the elements of the offense charged because there was no evidence that he touched the alleged victim or experienced sexual arousal or sexual gratification from the actions alleged*,* as is required under the definition of "sexual contact."[11]  *See Traverse*. This Court disagrees.  As discussed by the state appellate court, the alleged victim testified that Petitioner pulled her covers off, pulled her pants down and kissed her all over her body.  *Trial Transcript*, at 171. Petitioner persisted in trying to kiss her "lower and lower." *Id.* at 172.  She attempted to prevent him from doing so, but "he succeeded in everything that he tried." *Id.*  He

---

[11]  O.R.C. § 2907.01(B) defines "sexual contact" as follows:

"Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

succeeded at sexually abusing her and kissing her. *Id.* The testimony of the alleged victim, if believed, is sufficient to sustain Petitioner's conviction for gross sexual imposition. Moreover, "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006).

Claim six is without merit.

## CLAIM EIGHT

In claim eight, Petitioner asserts that he was denied the effective assistance of appellate counsel. The *Petition* suggests that Petitioner intends to raise in this action the same claims that he raised in his Rule 26(B) proceedings, *i.e.*, that he was denied the effective assistance of appellate counsel because his attorney failed to raise on appeal: 1) a claim that he was denied a fair trial when the trial court permitted transcripts in the jury room during deliberations; 2) he was denied his right to a speedy trial; 3) prosecutorial misconduct during opening and closing argument; and 4) denial of a fair trial due to cumulative error. *See Exhibit 45* to *Return of Writ.*[12] The state appellate court rejected Petitioner's ineffective assistance of appellate counsel claim in relevant part as follows:

> Upon consideration the court finds that the additional assignments of error do not give rise to a "genuine issue" as to whether Appellant was deprived of the effective assistance of appellate counsel under the two-prong analysis of *Strickland v. Washington* (1984), 466 U.S. 668. . . . The additional issues were raised and addressed in the direct appeal or it was a plausible and entirely reasonable tactic of appellate counsel to not raise issues of dubious merit. For these reasons, the motion for reopening is not well taken.

---

[12]To the extent that Petitioner attempts to raise additional claims of ineffective assistance of appellate counsel in his *Traverse,* these claims have not been presented to the state courts and, for the reasons discussed *supra*, have been waived. This Court will not address such additional allegations in these proceedings.

*Exhibit 48* to *Return of Writ*.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel.  *McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. at 687; *see also Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697. Because a petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if a court determines that the petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

The *Strickland* test applies to appellate counsel.  *Burger v. Kemp,* 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on'

38

those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes,* 463 U.S. 745, 751-52 (1983)). Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

> A. Were the omitted issues "significant and obvious?"
> B. Was there arguably contrary authority on the omitted issues?
> C. Were the omitted issues clearly stronger than those presented?
> D. Were the omitted issues objected to at trial?
> E. Were the trial court's rulings subject to deference on appeal?
> F. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> G. What was appellate counsel's level of experience and expertise?
> H. Did the petitioner and appellate counsel meet and go over possible issues?
> I. Is there evidence that counsel reviewed all the facts?
> J. Were the omitted issues dealt with in other assignments of error?
>
> K. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir.1999). The Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score." *Id.* at 428.

Petitioner complains that his attorney failed to raise on appeal a claim that he was denied a fair trial because the trial court, in response to a request from the jury, permitted the jury to review the transcripts of the testimony of the alleged victim during deliberations. A jury's review of the transcripts of trial testimony during deliberations does not, however, violate Ohio law. *See State v. Smoot,* No. 2588, 1989 WL 138412, at *5 (Ohio App. Nov. 17, 1989); *State v. Cox*, No. CA2005-12-513, 2006 WL 3345421, at *3 (Ohio App. 12th Dist. Nov. 20, 2006)(trial court's decision to provide

jury with transcript of the testimony of a witness falls within the discretion of the trial court); *State v. McCoy,* 2010 WL 4884442, at *8 (Ohio App. 1st Dist. Dec. 1, 2010)(reading of certain witnesses' testimony to the jury is not grounds for mistrial).  Moreover, and as noted by Respondent, the trial court provided the jury with the transcript Petitioner's own testimony, in addition to that of the alleged victim, *Trial Transcript,* at 374; 378-79, and cautioned the jury that it should consider the testimony of all witnesses.  *Id.* at 373.  Under these circumstances, Petitioner cannot establish either that his attorney performed in a constitutionally unreasonable manner or that he was prejudiced by his attorney's failure to raise this claim on appeal.

Petitioner also asserts that he was denied the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim that the prosecutor acted improperly during closing argument. First, Petitioner complains that the prosecutor vouched for the alleged victim when the prosecutor stated, during closing argument, "I submit to you, Sara told you the truth, that the defendant did these things to her."  *See Exhibit 45* to *Return of Writ; Trial Transcript,* at 353.[13] The prosecutor's argument was not inappropriate.  There was nothing improper about the prosecutor arguing for the truthfulness of the alleged victim, based on the credibility of her trial testimony.

Second, Petitioner complains of statements, made  during opening and closing argument, referring to a "role reversal."  *See Exhibit 45* to *Return of Writ.*  During opening statement, the

---

[13]  Taken in context, the prosecutor argued:

[C]onsider what you heard from Sara.  Consider the testimony that she gave you.  Consider the authenticity of what she said to you, consider the tears that flowed from her eyes.  Then consider what the defendant had to tell you.  She screamed, she ranted, she raved around the house.  Is that the girl you saw on the stand?  Ladies and gentlemen, I submit to you, Sara told you the truth, that the defendant did these things to her.  He sexually abused her and fondled her, he battered her, and he raped her, and you should find him guilty for each and every one of those acts.

*Trial Transcript,* at 353.

prosecutor stated in relevant as follows:

> Now, this family lived together. . . . Brian Heft would steal moments of time and touch his stepdaughter, and he did that because there was this role reversal going on.
>
> Sara's mother had suffered a stroke, and Sara was beginning to take on some responsibilities in the household.  Brian Heft came to see those responsibilities that Sara was taking on and came to view her as an adult and came to treat her as an adult. . . .  He was doing things to her that he shouldn't be doing to a teenage girl.

*Trial Transcript,* at 70.  During closing argument, the prosecutor argued:

> Now, Sara's mother had a stroke, and I can't explain it but I submit to you that there was just some kind of role reversal going on there. Sara was doing more around the house. . . . [Brian Heft] saw her acting like a mother and, you know, he just started treating Sara like an adult in every way.

*Id.* at 349-350.  Petitioner's claim in this regard is clearly without merit.  There was nothing inappropriate about the prosecutor arguing that Petitioner began sexually abusing his stepdaughter after her mother had suffered a stroke and the child began taking on the responsibilities of her mother.

Finally, Petitioner alleges that he was denied  the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim of cumulative error.  The record fails to reflect either error or cumulative error.

In short, Petitioner has failed to establish the ineffective assistance of appellate counsel.

Claim eight is without merit.

## CLAIM THIRTEEN

In claim thirteen, Petitioner alleges that he was denied his right to confront witnesses because the prosecutor "testified/stated" during opening or closing arguments to facts that were not

introduced during trial.  Additionally, Petitioner contends that "the prosecutor stated during closing arguments to an alleged 'role reversal' which Petitioner believes appears to be a psychological theory that was not introduced during trial." *Petition,* at 28.  Petitioner has withdrawn this claim except "to the extent it supports" his claim of insufficiency of the evidence.  *Motion to Withdraw*, Doc. No. 43, p. 1.  This claim does not alter this Court's conclusion, as discussed *supra*,  that Petitioner's claim of insufficiency of the evidence is without merit.

## CLAIM FIFTEEN

In claim fifteen, Petitioner alleges that he was denied due process and equal protection because he was denied "a valid final appealable order."  *Petition,* at 31.  Petitioner specifically contends that the trial court's April 2, 2009, judgment entry of sentence was not a valid final appealable order because the judgment did not include the trial judge's signature, failed to include a statement concerning the manner of conviction as required under Ohio's Rules of Criminal Procedure and otherwise failed to comply with Ohio law.  This claim presents an issue regarding only the alleged violation of Ohio law.  It therefore fails to present an issue appropriate for federal habeas corpus review. *See Pulley v. Harris, supra*, 465 U.S. at 41.

**WHEREUPON,** the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.** Petitioner's motion for an evidentiary hearing, Doc. No. 35, is **DENIED.**  Petitioner's motions to supplement the record, Doc. Nos. 29, 36, are **DENIED.**  Petitioner's motion to withdraw certain habeas corpus claims, Doc. No. 43, is **GRANTED.**

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14)

days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).


The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

   *s/ Norah McCann King*    
Norah McCann King
United States Magistrate Judge

May 25, 2012